**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SANDRA K. KIDD, parent and natural | : | No.  1:13-cv-2625 |
| guardian of JAMES FRED BROWN, for | : | |
| the benefit of JAMES FRED BROWN, | : | |
| an incapacitated individual, and | : | |
| MISTY MCNEAL, | : | |
| | : | |
| Plaintiffs, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| STATE FARM MUTUAL AUTOMOBILE | : | |
| INSURANCE COMPANY and STATE | : | |
| FARM FIRE AND CASUALTY | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### December 29, 2015

On October 27, 2015, a bench trial was held in the above-captioned matter.

At the conclusion of the trial, the Court issued a post-trial briefing schedule.  (Doc.

59).  The parties have now submitted proposed findings of fact and conclusions of

law (Docs. 63, 64, 66 and 67), as well as supplemental briefings.  (Docs. 60 and

62).  Accordingly, this matter is ripe for our review and disposition.  For the

reasons that follow, the Court finds for the Defendants, State Farm Mutual

Automobile Insurance Company and State Farm Fire and Casualty Company, and

shall enter judgment in their favor.

## I.    FACTS

Prior to October 1998, Plaintiff Sandra A. Kidd held an automobile insurance policy (policy number 613-6305, hereinafter, the "613 policy"), which included coverage for up to four vehicles.  One of these was purchased by her son, James Fred Brown, who was a resident relative in the Kidd household.  Around that time, it became the desire of Sandra Kidd and her husband, David Kidd, that Mr. Brown's vehicle be removed from the 613 policy and that Mr. Brown would secure his own policy.  At trial, Mr. Kidd testified that, as Mr. Brown reached adulthood, they wanted to effect this change to teach him responsibility.  At the time, Mr. Brown was eighteen years old and not yet incapacitated.  The 613 policy owned by Mrs. Kidd at that time already included reduced coverage for damage caused by under-insured or uninsured motorists ("UM/UIM") due to a "Sign-Down Form" that had been executed previously.

In October 1998, Mr. Kidd contacted the State Farm Agency of James Bair, in Huntingdon, Pennsylvania.  Mr. Bair had worked with the Kidds in the past to procure them coverage under the 613 policy.  Mr. Kidd expressed the above intentions to Mr. Bair, and Mr. Bair mailed forms to the Kidd household to effect the desired policy change.  On October 27, Mrs. Kidd executed a "Change Memo"

effecting a title transfer to her son, Mr. Brown.  On the Change Memo, the relevant

policy number was initially listed as the 613 policy.  However, that policy number

was later stricken, and underneath it was written "7334060-001" (the "733 policy

number").

On either October 27 or 28, 1998, Mr. Brown executed a sign-down form,

agreeing to coverage of $15,000/$30,000, an amount lower than the original

liability coverage of $100,000/$300,000.  The parties do not dispute the fact that

Mr. Brown lowered the liability coverage at that time.  On that form, the 613

policy number was initially written but also later stricken and replaced by the 733

policy number.  On the same day, Mr. Brown executed an "Important Notice

Form," which, like the other forms, originally bore the 613 policy number, but this

was later stricken and replaced by the 733 policy number.  At the time of Mr.

Brown's signature, the first paragraph of the sign-down form read:

> I understand that this acknowledgment of coverage selection shall be
> applicable, as of the date specified above, to the policy of insurance
> identified above, on all replacement policies and on all renewals of
> either this policy or any replacement policy, unless I request in writing
> a different selection for such coverage.

The executed forms were then mailed back to Mr. Bair.

On March 7, 2002, Mr. Brown purchased another vehicle and added his

fiancé, Misty McNeal, as a named insured on his policy.  At that time, neither Mr.

Brown nor Ms. McNeal executed a new sign-down form.

On January 24, 2010, Mr. Brown was rendered incapacitated in an automobile accident involving an uninsured or underinsured motorist. Plaintiffs made a claim for benefits under the 733 policy, asking for UM/UIM benefits for Mr. Brown and Ms. McNeal, in the amount of $100,000.00. Defendants later indicated that they would pay only $15,000.00, due to their understanding that the policy included only reduced UM/UIM coverage.

Approximately one year after the accident, Mr. Brown and Ms. McNeal both executed as many as four important notice forms and UM/UIM sign-down forms, selecting coverage limits of $15,000.00 per person and $30,000.00 per accident rather than the higher limits available. These forms list the 733 policy number.

Plaintiffs filed the underlying action in state court on September 20, 2013, seeking a declaration that the 1998 UM/UIM sign-down form signed by Mr. Brown was not effective as to the 733 policy and/or not effective as to Ms. McNeal and directing Defendants to provide UM/UIM coverage in an amount equal to full liability coverage. Defendants filed a Notice of Removal on October 23, 2013 (Doc. 1), thereby removing the matter to this Court.[1]

---

[1]   There is complete diversity of parties and the matter in controversy exceeds the statutorily set limit of $75,000.00. This Court therefore enjoys diversity jurisdiction over the case, pursuant to 28 U.S.C. § 1332.

4

## II.    DISCUSSION

This suit arises under the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §§ 1701-1799.7 ("MVFRL").  The MVFRL was enacted to control the costs of automobile insurance, and also to address issues caused by uninsured and underinsured motorists.  *Lambert v. McClure*, 595 A.2d 629, 631 (Pa. Super. 1991).  UM/UIM coverage provides "protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of uninsured [or underinsured] motor vehicles."  75 Pa.C.S. §§ 1731(b), (c); *Lewis v. Erie Ins. Exchange*, 793 A.2d 143, 150-52 (Pa. 2002).  Purchase of UM/UIM coverage is optional but must be offered as part of or in supplement to motor vehicle insurance. *See id*. § 1734.

"[I]n order to show that an insured validly reduced UM/UIM benefits, an insurance company must show that: (i) the insured had notice of his rights under the MVFRL; and (ii) the insured voluntarily requested in writing that the limits of his UM/UIM coverage be lowered."  *State Farm Mut. Auto. Ins. Co. v. Vollrath*, No. 04-2937, 2005 WL 1249229, at *2 (3d Cir. May 26, 2005) (citing *Jiongo v. Nationwide Ins. Co.,* No. CIV A. 97-2437, 1998 WL 381706, at *6 (E.D.Pa. July 8, 1998)).

The sole issue in this case is whether Mr. Brown waived his right to UM/UIM coverage equal to his bodily injury coverage when he executed the 1998 sign-down form.  Plaintiffs make a variety of arguments that he did not validly waive the higher coverage.  First, they argue that the sign-down form executed by Mr. Brown was ambiguous and thus must be construed in favor of the insured.  Plaintiffs suggest that a plain reading of the form could have led Mr. Brown to believe that he was executing a sign-down pertaining to his mother's policy.

Second, Plaintiffs argue that because the form was provided to Mr. Brown by mail, his rights under the MVFRL were not sufficiently explained and the sign-down is therefore invalid.

Finally, Plaintiffs argue that at some point after Mr. Brown and Mrs. Kidd signed the change memo, UM/UIM sign-down form, and important notice form in 1998 but subsequent to March 2002, originally regarding the 613 policy, those forms were altered to reflect the 733 policy number.  Doc. 19-5, ¶ 7.  Specifically, they explain that "someone at the Defendants [sic] business or on behalf of the Defendant, crossed out the old policy number to make it appear that the Plaintiffs had signed a new 'sign down' form for the 733 policy.  The date of this alteration, and the identity of who altered it, are unknown." *Id.*

In the alternative, Plaintiffs argue that if this Court finds that the sign-down

form executed by Mr. Brown applies to Mr. Brown's 733 policy, then the sign-down form is inapplicable as to Ms. McNeal.

### A.  Ambiguity in the Sign-Down Form

We begin by addressing Plaintiffs' first argument that the sign-down form executed by Mr. Brown was impermissibly ambiguous and thus must be construed in favor of the insured.  Plaintiffs argue that because the language of the sign-down form states that "I understand that this acknowledgment of coverage selection shall be applicable to . . . the policy of insurance identified above" and the policy number identified on the form was the 613 number, Mr. Brown could have believed he was executing a sign-down form for his mother's policy, the 613 policy.  For the following reasons, we disagree.

"The primary goal in interpreting a contract is to determine the intent of the parties, and the best way to arrive at this intent is to look to the plain language of the instrument." *Bricker v. State Farm Mutual*, No. 102 MDA 2014, 2014 WL 6091449, at *8, slip op. (Pa. Super. Ct. Aug. 22, 2014) (citing *Am & Foreign Ins. Co. v. Jerry's Sports Ctr., Inc.*, 2 A.3d 526, 540 (Pa. 2010)).  When interpreting an insurance contract, "[t]he insured's reasonable expectations are the focal point in reading the contract language." *Lambert v. McClure*, 595 A.2d 629, 631 (Pa. Super. 1991) (quoting *Geisler v. Motorists Mut. Ins. Co.*, 556 A.2d 391, 393 (Pa.

Super. 1989)).  "The language of a contract should be given its plain meaning, but if ambiguity exists, the particular ambiguous provision is to be construed in favor of the insured."  *Bricker*, 2014 WL 6091449, at *8 (citing *Am & Foreign Ins. Co.*, 2 A.3d at 540).

The Supreme Court of Pennsylvania, in describing the attributes of ambiguity in an earlier case, has stated that:

> [c]ontractual language is ambiguous if it is reasonably susceptible [to] different constructions and capable of being understood in more than one sense.  This is not a question to be resolved in a vacuum.  Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts.

*Prudential Prop. & Cas. Ins. Co. v. Sartno*, 903 A.2d 1170, 1174 (Pa. 2006) (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)).

Given the particular set of facts in the instant case, we find that the contractual terms at issue could only be interpreted in one way, and therefore are not ambiguous.  Paramount to our analysis today, we emphasize that the reasonable expectations of the parties and the particular set of facts under which a contract was executed are important considerations when determining the meaning of that contract.  Here, according to Mr. Brown's testimony and Mr. Bair's affidavit, all four parties – Mr. Brown, Mr. Kidd, Mrs. Kidd, and Mr. Bair – were under the impression, and had the expectation, that Mr. Brown was obtaining his own new

automobile insurance policy through his execution of the forms in question. Indeed, they had requested that precisely such an action occur. Thus, that Mr. Brown would expect a single form of the several he was executing to constitute a sign-down for his mother's policy, which no one believed was being altered except to have Mr. Brown's vehicle removed from it, runs against the parties' unvarying expectations of the primary purpose of the forms. Also, the UM/UIM coverage on Mrs. Kidd's policy had already been reduced by Mrs. Kidd at an earlier time, making it even less likely that Mr. Brown would presume he was currently electing to reduce the other policy's coverage with this particular sign-down form. We therefore find it very improbable that Mr. Brown construed the sign-down form in the way that Plaintiffs suggest, despite the fact that the form bore the "613" policy number. As Mr. Brown was primarily engaged in the establishment of his own new and separate policy, it is far more likely and reasonable to infer that Mr. Brown expected that the sign-down pertained to that new policy and not to his mothers'.

Further, Mr. Brown was eighteen years old at the time that he executed these forms. Mr. Kidd testified that when he gave Mr. Brown the forms to sign, they did not discuss their contents. We find it extremely unlikely that, of all the members in the household covered under the policy, Mr. Brown would be the one to alter his

mother's coverage.  Indeed, Mr. Brown did not own th epolicy issued to his mother but was simply a covered person thereunder.  Rather, were Mr. Brown under the impression that he was making an election to change his mother's policy, we find it likely that he would have consulted either his stepfather, who testified as being the member of the household who typically handled such matters, or his mother, before doing so.  Mr. Kidd testified that no such consultation occurred, making it unlikely that the ambiguous interpretation that the Plaintiffs allege ever in fact arose.

Lastly, we emphasize that, subsequent to Mr. Brown's execution of the forms, he enjoyed reduced premiums as a result of the decreased coverage.  We did not hear testimony on any events taking place after the forms were signed, but the reduction Mr. Brown benefitted from presumably placed him on notice of the lesser UM/UIM coverage, and any mistake or unintended reduction of coverage could have been rectified between 1998 and 2010, when Mr. Brown's accident took place.  But no such rectification occurred.  Rather, Mr. Brown continued to enjoy savings throughout that span of time.  In the past, courts have been hesitant to find insurance coverage for which insureds have not paid.  *See Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 639-41 (3d Cir. 2000) (holding an insured "bound by having understood the policy limits and acquiesced to them by paying

lower premiums"); *Kimball v. Cigna Ins. Co.*, 660 A.2d 1386, 1388-89 (Pa. Super. 1995) (finding a UM/UIM sign-down form valid where "the plaintiff accepted the policy with the lower limits without complaint and permitted payment of the lower premium without incident."). Thus, in the instant case we too decline to make that leap.

In making their opposing argument, Plaintiffs rely heavily on the case *Bricker v. State Farm Mutual*, No. 102 MDA 2014, 2014 WL 6091449, at *8, slip op. (Pa. Super. Ct. Aug. 22, 2014). There, a sign-down form was found to be ambiguous where it was signed on the day a new policy was issued and bore the old policy's number. The plaintiff, Mrs. Bricker, had already executed a sign-down on her previous policy numbered 016-4416 in 2000. *Bricker*, 2014 WL 6091449, at *2. She executed another sign-down bearing the same policy number in August 2004, when she was in the process of terminating the 016-4416 policy and opening a new one. *Id*. at *2, *11. In both cases, Mrs. Bricker was the named insured on each policy, and she had requested and paid for both policies. The Pennsylvania Superior Court found that the trial record lacked extrinsic evidence supporting State Farm's assertion that Mrs. Bricker understood that the second sign-down bearing the 016-4416 policy number in actuality pertained to her new

11

policy.[2]  *Id.* at *13-*14.   As such, the court determined that the policy was ambiguous and interpreted it in favor of the insured.  *Id.* at *14.

    We distinguish this opinion from the facts of the instant case.  In *Bricker*, though all the forms Mrs. Bricker signed referenced her old policy number, some of those forms also referred to the new policy, which became effective on September 1, 2004.  *Id*. at *2.  Others did not.  The fact that this information was featured on some forms but not others renders the process by which those forms were signed ambiguous and confusing.  Notably, the opinion reveals that the same language referencing the new policy could have been used on Mrs. Bricker's new sign-down form, thereby correcting the ambiguity at issue.  In contrast, and as we will discuss more fully below, the policy number for Mr. Brown's policy was not available and could not have been so used.

     Further, the lower court ruling in *Bricker* was decided on a motion for summary judgment, and the Superior Court determined that evidence was lacking to support the lower court's decision.  Specifically, the appellate court noted that

---

[2]  "[T]he trial court rests its decision on inferences that are unsupported by the record.  It notes that Bricker signed the forms on August 18, 2004, but then accepts State Farm Mutual's assertion that the forms related to the new policy, dated September 1, 2004, without any evidence to support the truth of that assertion, or even to clarify the circumstances or purpose of the signing.  Finally, the trial court incorrectly penalizes Bricker for failing to explain why she signed the forms on August 18, 2004, when that burden should have properly been assigned to State Farm Mutual."  *Bricker*, 2014 WL 6091449, at *13-*14.

there was no evidence to support State Farm's assertion that the forms related to the new policy, and no information surrounding the circumstances or purpose of the signing. *Id*. at *13-*14. Here, however, the record is not so sparse. Unlike in *Bricker*, the parties here acknowledge that Mr. Brown was signing the insurance forms in furtherance of his intent to obtain a new policy while his mother retained the old policy. It is far more tenuous to suppose that Mr. Brown, in the process of obtaining his own policy, would alter his mother's policy as well. Conversely, Mrs. Bricker was the named insured on both policies, and thus it is more likely that she might think that one form pertained to one policy while signing others pertaining to her new coverage.

For these reasons, we easily differentiate the facts of *Bricker* from those of the instant case. We find that, given the circumstances under which Mr. Brown executed the sign-down form, Plaintiffs have failed to show by a preponderance of the evidence that Mr. Brown could have interpreted the sign-down form to pertain to his mothers' coverage, and not his. The sign-down form thus lacks the requisite ambiguity and we cannot construe it in favor of Plaintiffs.

## B.    Validity of the Sign-Down Form

We move now to Plaintiffs' argument regarding whether Mr. Bair had sufficiently explained Mr. Brown's rights under the MVFRL. Plaintiffs suggest

13

that, because the form was provided to Mr. Brown by mail, his rights under the

MVFRL were not sufficiently explained to him and the sign-down is therefore

invalid.  According to § 1791 of the MVFRL, "[i]t shall be presumed that the

insured has been advised of the benefits and limits available under this chapter

provided the following notice in bold print of at least ten-point type is given to the

applicant at the time of application for original coverage . . . ." 75 Pa. C.S.A. §

1791.

The notice set forth in § 1791 is identical to that which was provided to Mr.

Brown in the important notice form that he executed along with the sign-down

form.  While Plaintiffs are correct to argue that the important notice form creates a

presumption that Mr. Brown understood his rights that can be rebutted by

testimony, *see Lambert*, 407 Pa. Super at 263-64 (holding that where appellant

never alleged that it gave Lambert the "Important Notice" of § 1791 or any other

adequate notice of his rights, the notification requirement of the MVFRL was not

met); *State Farm v. Vollrath*, 2005 WL 1249229 at *2 (holding that Vollrath

validly waived coverage where insurer mailed Vollrath the "Important Notice

Form" and Vollrath's testimony that he did not receive it was "unpersuasive and

unconvincing"), no testimony was adduced that indicates that Mr. Brown was not

in receipt of the notice, nor unaware of the rights provided under the MVFRL after

14

his receipt of that notice.  The presumption established by § 1791 of the MVFRL

therefore still stands, and we are compelled to determine that by executing the

important notice form, Mr. Brown had been advised of the benefits available to

him through UM/UIM coverage.

### C.    Foul-Play in the Alteration of the Sign-Down Form

We next address Plaintiffs' argument that at some point subsequent to March

2002, the change memo, the UM/UIM sign-down form, and the important notice

form, originally executed in 1998 and in regards to the 613 policy, were altered to

reflect the 733 policy number.  Doc. 19-5, ¶ 7.  As noted above, Plaintiffs explain

that "someone at the Defendants [sic] business or on behalf of the Defendant,

crossed out the old policy number to make it appear that the Plaintiffs had signed a

new 'sign down' form for the 733 policy.  The date of this alteration, and the

identity of who altered it, are unknown." *Id.*

Not an iota of evidence was presented at trial to support the Plaintiffs'

allegations of foul play.  Instead, Defendants' witness, Mr. Crisanti, testified that it

was standard practice at that time for State Farm agents to present new insureds

with a sign-down form at the time that their new policy was being drawn up.  As

no policy number was generated at that early time, the sign-down forms either bore

an old policy number or none at all.  Once generated, the new policy number

15

would be written into the form, and any inapplicable number scratched out by the

underwriting service assistant.  We find the system Mr. Crisanti described to be

plausible and the evidence, including the alterations on the forms described above,

to support his description of the State Farm procedures.

Plaintiffs counter that there may have been other ways to have insureds

execute sign-down forms that would result in the forms bearing the accurate policy

number.  However, Defendants explain that they are required to provide coverage

to their clients immediately after approval of insurance applications.  There is no

time to wait for a new policy number.  Thus, unless a sign-down form can be

submitted in conjunction with a new insurance application, the insurance provided

will not be able to reflect a client's desire to pay less for reduced coverage.  Rather,

defendants would have no choice but to provide the maximum coverage and have

clients pay higher premiums until their policy number can be generated and applied

to the necessary forms to alter their coverage.

Further, Defendants point out that "Section 1734 of the Pa. MVFRL contains

no requirement that the policy number be included on the 'sign down' form or

other 'writing.'"  Doc. 54, pg. 7.  No complaint or admonition was ever

administered to the insurance agency by the state for the nature of their system.

We are presented with no reason to doubt that this was indeed the system in use at

the time that Mr. Brown's policy was issued, and its use explains the reason for the

old policy number reference and why it was stricken and replaced by a new

number.  Though the system may be imperfect, there is no requirement that

Defendants implement the most ideal system, and we thus conclude that

Defendants' explanation is plausible and that Plaintiffs are unable to support their

entirely speculative allegations of wrongdoing.

### D.     The Sign-Down Form's Applicability to Misty McNeal

We have found that the sign-down form executed by Mr. Brown was not

impermissibly vague, that Mr. Brown was aware of his rights under the MVFRL,

and that Defendants did not subsequently alter the Plaintiffs' forms in an attempt to

contravene Plaintiffs' desired coverage.  Thus, each of Plaintiffs arguments fail to

show by a preponderance of the evidence that the sign-down form executed by Mr.

Brown applies to his parents' 613 policy and not his own 733 policy.  We turn now

to Plaintiffs' alternative argument that Mr. Brown's sign-down form is inapplicable

to the policy as it pertains to Ms. McNeal.

As noted above, in 2002 Mr. Brown added Ms. McNeal to his automobile

insurance policy.  Neither Ms. McNeal nor Mr. Brown executed sign-down forms

at the time that her name was added.  Plaintiffs argue that because Ms. McNeal

failed to execute her own sign-down, the reduced coverage requested by Mr.

Brown does not apply to her.  However, they cite to no case law supporting this

contention.  Indeed, Pennsylvania case law indicates that the opposite is true.

In *Kimball v. Cigna Ins. Co.*, 660 A.2d 1386 (Pa. Super. 1995), the

Pennsylvania Superior Court held that the plaintiff, who was an insured under her

parents' automobile insurance policy, was bound by the sign-down form executed

by her mother even though the agency did not inform her of the reduced coverage.

*Kimball*, 660 A.2d at 1387.  The court held that

> to find that the plaintiff is not bound by her mother's election and
> remaining silent on the issue of increased coverage, while reaping the
> benefits of reduced rates, would be to reward inaction.  Here, the
> plaintiff had the means and opportunity to avoid any insurance
> shortfall, but she took no action to remedy the matter.

*Id*. at 1389.

Further, in *Nationwide Mutual Ins. v. Buffetta*, 230 F.3d 634 (3d Cir. 2000),

the Third Circuit held that the insured was not entitled to coverage beyond the

reduced coverage amount that her former husband had elected when he was the

named insured on the policy.  Only Mr. Buffetta, and not the plaintiff, Mrs.

Buffetta, had executed the sign-down form.  As Mrs. Buffetta was already insured

under the policy when the reduced coverage was elected, the facts there are

somewhat distinguishable from *Kimball*.[3]  However, the same principle that where an insured "with ample opportunity to alter the coverage under the policy, having received ongoing notice of the amount of coverage under her policy, and having paid premiums that took such coverage limits into account . . . [is] bound by the coverage choices made by the previous named insured under the policy" is employed in both cases.  *Buffetta*, 230 F.3d at 642.

The same rationale applies to the instant case.  Here, too, Ms. McNeal could have made herself aware of the coverage provided by Defendants by asking about the UM/UIM liability limits.  Further, "[f]rom October 28, 1998 through the date of Mr. Brown's accident, January 24, 2010, Mr. Brown paid reduced premiums for the UIM coverage elected by the 1998 sign-down form for policy 7334060."  Doc. 54, pg. 3.  This statement was confirmed by Mr. Crisanti's testimony at trial.  This makes Plaintiffs' situation analagous to that described in *Kimball* and *Buffetta*, in which plaintiffs there also enjoyed reduced coverage with ample opportunity to alter the policy.  As such, we come to the same conclusion.  Defendants did not

---

[3]  The dissent in *Buffetta* distinguished the facts of *Buffetta* from *Kimball* because, at the time that the reduced coverage was elected, Mr. Buffetta was the sole named insured under the policy.  Mrs. Buffetta became the sole named insured subsequent to their divorce, and as such it could be argued that due to this change her acquiescence was needed to continue the reduction in coverage.  Conversely, in *Kimball*, the daughter became an additional named insured on her mother's policy while her mother remained covered by the same policy as well.

The facts of the instant case are more analogous to *Kimball*, as Mr. Brown remained an insured on his policy after Ms. McNeal was added.  *Buffetta*'s dissent is thus inapplicable.

need to procure an additional sign-down form from Ms. McNeal in order for her to be subject to the same coverage limitations as Mr. Brown, as she had ample notice of the reduced coverage and enjoyed smaller premium payments.

Plaintiffs' final argument suggests that in requesting Mr. Brown and Ms. McNeal to execute additional sign-down forms after Mr. Brown's accident, Defendants acted in a manner inconsistent with the assertion by State Farm that the original 1998 'sign down' form (as to the 613 policy) was applicable to the 733 policy. Plaintiffs assert that there would be no need for these additional sign-down forms if the 1998 sign-down applied to the 733 policy. Mr. Crisanti testified to the effect that these additional forms had no identifiable purpose. We find that in requiring additional sign-down forms, the Defendants acted in an abundance of caution. They could not have been certain of the outcome of this litigation, and by obtaining the additional sign-down forms, merely assured themselves that the coverage provided to Mr. Brown and Ms. McNeal in the aftermath of Mr. Brown's accident was, indeed, of the sort that all parties intended. We cannot fault Defendants for this precautionary behavior, and do not find that it in any way adversely affects the conclusions that we reach today.

III.   CONCLUSION

In summary, we find that Plaintiffs arguments fail to prove by a preponderance of the evidence that Mr. Brown's sign-down form did not apply to his own 733 policy.  Rather, Defendants' explanation of the facts is far more plausible.  We therefore hold Mr. Brown's sign-down form applicable to his 733 policy, and as such, further hold that Mr. Brown validly waived the increased UM/UIM coverage.  Therefore, Plaintiffs are not entitled to additional liability coverage beyond the $45,000 that Defendants have already paid.  An appropriate Order shall issue wherein we enter judgment in favor of Defendants.

 s/ John E. Jones III
John E. Jones III
United States District Judge